■ Bull & Bear Group, Inc., Appellant, v James W. Fuller, Respondent.—Order of the Supreme Court, New York County (Myriam J. Altman, J.), entered on May 12, 1989, which, *inter alia*, denied plaintiff's motion for summary judgment in lieu of complaint pursuant to CPLR 3213, is reversed on the law to the extent appealed from and the motion for summary judgment granted, with costs and disbursements.

Plaintiff Bull & Bear, a publicly traded company engaged in the management of mutual funds, commenced this action to recover a sum of money based upon the default of payments due and owing on a promissory note executed by defendant James W. Fuller. In that regard, defendant, who was then president of his own investment firm in San Francisco, was contacted by an executive recruiter on behalf of plaintiff to discuss possible employment with the company. Following a number of meetings between defendant and a representative

of plaintiff, Fuller received an invitation from Bull & Bear to become president, chief operating officer and director of the firm. This offer was contained in a letter dated September 6, 1985, which Fuller countersigned on September 20, 1985 as having been "Agreed to and Accepted." Pursuant to the letter agreement, defendant was to "be granted the maximum number of five year stock options ($100,000) permitted under the Company's Incentive Option Plan". Accordingly, plaintiff would sell to him 250,000 shares of Class A Common Stock (later adjusted to 50,000 shares as a result of a one-for-five reverse split of the common stock) "at the market price of the Company's stock on the date your employment commences." Further, the letter stated that: "You will pay $2,500 cash (the par value of such shares) on such date and the balance of the purchase price will be financed over a five year period with interest at 6% per annum. The interest will be payable semiannually and the principal will be payable on the fifth anniversary of the date you purchase such stock. The Company will have the right to repurchase 200,000 of such shares at your cost should you leave employment with the Company for any reason within one year of the date your employment commences, 150,000 shares within two years, 100,000 shares within three years and 50,000 shares within four years."

Defendant began his employment will Bull & Bear on October 17, 1985. Less than two months later, in accordance with a stock purchase agreement and note dated December 3, 1985, the terms under which Fuller was to buy what had now been adjusted to 50,000 shares were reduced to a written contract which he undisputedly signed. Under this contract, he agreed to pay $10.00 per share, $2,500 of which was to be in cash and the remainder by means of a promissory note in the principal amount of $497,500. Fuller thereafter executed such a note providing that interest on the unpaid balance would accrue at 9 percent per year payable semiannually on June 3rd and December 3rd of each year. This 1985 note was exchanged the next year for the note which is the subject of the instant litigation, the only difference between the two being that in the second note the interest rate was decreased to 6.2 percent. Both notes stated that if Fuller defaulted in the payment of interest, the entire unpaid balance of principal and interest could be accelerated at plaintiff's option.

Defendant failed to make the interest payments due on both June 3, 1987 and December 3, 1987. He resigned from the company, effective December 31, 1987, because he allegedly objected to its hiring practices. After he also neglected to meet

the payment due on June 3, 1988, Bull & Bear notified him by registered mail that he was in default. When no reply was forthcoming, plaintiff again wrote to Fuller, this time exercising its contractual right to accelerate payment of the unpaid principal and interest. Defendant did not respond, and the present action ensued. In it, plaintiff seeks summary judgment in lieu of complaint pursuant to CPLR 3213. Defendant has cross-moved for summary judgment, claiming Bassett Winmill, Bull & Bear's Executive Officer and Controlling Shareholder, and Perez Ehrich of Townley & Updike, plaintiff's corporate counsel, both promised him that the stock purchase, which he was purportedly compelled to make as a condition of his employment, was merely for the purpose of giving the appearance that he possessed equity in the company and that the promissory note would never be enforced. Further, he asserts that he was unrepresented by an attorney in connection with his execution of the purchase agreement and note. In addition, plaintiff's conduct in not seeking payment of interest installments due in 1986 and 1987, he states, is consistent with the fact that the company had no intention of enforcing the note until September of 1988 when, after nearly three years of ignoring defendant's non-payment, it suddenly reversed its position, demanded supposed back interest and threatened acceleration of the note. Moreover, by the time that Bull & Bear insisted on compelling payment, the price of its stock had fallen drastically, Fuller alleges, thereby rendering the subject shares worth a great deal less than the company was endeavoring to collect from defendant. As a consequence, plaintiff would reap an enormous windfall from valueless stock that defendant did not wish to own, that he could not vote or even sell without Bull & Bear's acquiescence. Thus, it is Fuller's contention that he has advanced claims of fraud and unconscionability sufficient to defeat summary judgment in favor of plaintiff.

The Supreme Court, while rejecting defendant's assertion pursuant to Labor Law § 198-b that the note was an unlawful condition of his employment, found that "[a]t a minimum, however, Fuller has raised a triable issue of fact as to whether there was adequate consideration given in exchange for the note * * *. The shares given to Fuller were nonvoting, unregistered, nontransferable and carried many restrictions and options favoring Bull & Bear." Since only plaintiff has appealed from the Supreme Court order, this court will not here consider any of the various matters asserted by defendant.

An examination of the record does reveal that there were

some restrictions on the sale of the stock, the most notable one being that the shares had to be registered under the Securities Act of 1933, as amended, or under the securities laws of any State prior to their being transferred unless, in the opinion of the corporate counsel, an exemption to such registration was available. However, there is no outright prohibition against transfer of the stock or a provision giving Bull & Bear a first option to buy during defendant's employment with the company. Fuller could certainly have sold the stock at any time during his tenure at Bull & Bear, and there is nothing unusual, nor certainly unconscionable, about the inclusion of an option clause in a contract with a business which has a stock-purchase plan for its senior managers. As for the shares being non-voting, they were Class-A common stock and were all non-voting, whether available to the general public or sold to defendant. Similarly, the fact that the price of the shares subsequently dropped is irrelevant in that Fuller apparently paid the price prevailing at the time of his acquisition of them, and he was no less immune from the vagaries of the market than any other shareholder. In addition, the stock purchase agreement and note are clear and unambiguous on their face. There is a specific disclaimer in the stock purchase agreement that: "Fuller represents and warrants that he is familiar with the financial and business affairs of Group, has had an opportunity to make an inspection of Group's business and financial statements and to ask such questions of officers and employees of Group as he deemed relevant, and with respect to the purchase of the shares he is not relying upon any representations or warranties of Group or of any other person."

There is also proof that during his employment with Bull & Bear, Fuller expressly acknowledged that he owned the shares, as evidenced by the minutes of a special meeting of the firm's Board of Directors on December 15, 1986 and the company's SEC Form 10-K filed for the fiscal year ending December 31, 1986, both of which he signed. In any event, in the absence of fraud or unconscionability, the adequacy of consideration may not be reviewed by the courts *(Spaulding v Benenati,* 57 NY2d 418, 423), and there is simply no fraud or unconscionability apparent in the record sufficient for defendant to avoid summary judgment against him. He signed a number of documents, as well as the stock purchase agreement along with its disclaimer and the note, which indicate that he clearly accepted the stock ownership. As the court observed in *Columbus Trust Co. v Campolo* (110 AD2d 616,

617, *affd for reasons stated below* 66 NY2d 701), "[a]s a general rule, the signer of a written agreement is conclusively bound by its terms unless there is a showing of fraud, duress or some other wrongful act on the part of any party to the contract". Moreover, there is a heavy presumption, not overcome herein, that " 'a deliberately prepared and executed written instrument manifest[s] the true intention of the parties' " *(Chimart Assocs. v Paul,* 66 NY2d 570, 574, quoting *Backer Mgt. Corp. v Acme Quilting Co.,* 46 NY2d 211, 219). Finally, it should be noted that defendant is simply precluded from alleging fraud in the inducement where he has specifically disclaimed reliance upon oral representations or other warranties *(Citibank v Plapinger,* 66 NY2d 90). Consequently, plaintiff is entitled to summary judgment in lieu of complaint pursuant to CPLR 3213. Concur—Ross, J. P., Milonas, Asch, Ellerin and Rubin, JJ.